**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GENERAL ELECTRIC PENSION TRUST; GE RSP U.S. EQUITY FUND; GE INSTITUTIONAL FUNDS; GE INVESTMENT FUNDS, INC.; and ELFUN TRUSTS; | Case No. 15-cv-00957 (LTS) (DCF) |
| Plaintiffs, | Oral Argument Requested |
| v. | |
| AMERICAN INTERNATIONAL GROUP, INC.; | |
| Defendant. | |

## <u>DECLARATION OF MITCHELL M.Z. TWERSKY</u>

I, MITCHELL M.Z. TWERSKY, hereby declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the following is true and correct:

1.      I am a partner of the law firm Abraham, Fruchter & Twersky, LLP, counsel for Plaintiffs General Electric Pension Trust, GE RSP U.S. Equity Fund, GE Institutional Funds, GE Investment Funds, Inc., and Elfun Trusts.   I am an attorney admitted to practice before this Court, and I respectfully submit this declaration in support of the Plaintiffs' Opposition To Motion To Dismiss filed in in the above-captioned action.

2.      Attached hereto as Exhibit A is a true and correct copy of Plaintiffs' Omnibus Opposition To Defendants' Joint Omnibus Motion To Dismiss On Timeliness Grounds filed in *Kuwait Investment Authority v. American International Gorup, Inc.*, No. 11-cv-08403-LTS-DCF (S.D.N.Y. March 6, 2015), as well as in other actions brought on behalf of plaintiffs that have excluded themselves from the settlement class in *In re American International Group, Inc. 2008 Sec. Litig.*, No. 08-cv-4772 (S.D.N.Y.).

Executed on this 7th of May, 2015, in New York, New York.


By:   /s/ *Mitchell M.Z. Twersky*
          Mitchell M.Z. Twersky

# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| KUWAIT INVESTMENT AUTHORITY,<br><br>Plaintiff,<br><br>v.<br><br>AMERICAN INTERNATIONAL GROUP, INC.,<br>MARTIN J. SULLIVAN, STEVEN J. BENSINGER,<br>JOSEPH CASSANO, ANDREW FORSTER, ALAN<br>FROST, DAVID HERZOG, and ROBERT LEWIS,<br><br>Defendants. | No. 11 Civ. 8403 (LTS) (DCF) |
| OPPENHEIMER EQUITY FUND, INC.;<br>OPPENHEIMER VARIABLE ACCOUNT FUNDS;<br>PANORAMA SERIES FUNDS, INC.;<br>OPPENHEIMER MAIN STREET FUND, INC.;<br>OPPENHEIMER MAIN STREET SELECT FUND<br>f/k/a Oppenheimer Main Street Opportunity Fund;<br>OPPENHEIMER RISING DIVIDENDS FUND f/k/a<br>Oppenheimer Quest Value Fund, Inc.;<br>OPPENHEIMER GLOBAL ALLOCATION FUND<br>f/k/a Oppenheimer Quest Balanced Fund;<br>OPPENHEIMER CAPITAL APPRECIATION<br>FUND; OPPENHEIMER GLOBAL FUND;<br>OPPENHEIMER GLOBAL VALUE FUND;<br>OPPENHEIMER EQUITY INCOME FUND, INC.<br>f/k/a Oppenheimer Quest Capital Value Fund, Inc.;<br>and OFITC GLOBAL FUND,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN INTERNATIONAL GROUP, INC.,<br>MARTIN J. SULLIVAN, STEVEN J. BENSINGER,<br>JOSEPH CASSANO, ANDREW FORSTER, ALAN<br>FROST, DAVID L. HERZOG, ROBERT LEWIS,<br>STEPHEN F. BOLLENBACH, MARSHALL A.<br>COHEN, MARTIN S. FELDSTEIN, ELLEN V.<br>FUTTER, STEPHEN L. HAMMERMAN,<br>RICHARD C. HOLBROOKE, FRED H. | No. 12 Civ. 523 (LTS) (DCF) |

LANGHAMMER, GEORGE L. MILES, JR.,
MORRIS W. OFFIT, JAMES F. ORR III, VIRGINIA
M. ROMETTY, MICHAEL H. SUTTON, EDMUND
S.W. TSE, ROBERT B. WILLUMSTAD, and
FRANK G. ZARB,

            Defendants.

---

BRITISH COAL STAFF SUPERANNUATION
SCHEME; MINEWORKERS' PENSION SCHEME;
FÖRSTA AP-FONDEN; TAYSIDE
SUPERANNUATION FUNDS; INTERNATIONAL          No. 12 Civ. 4555 (LTS) (DCF)
FUND MANAGEMENT S.A.; DEKA
INTERNATIONAL S.A. LUXEMBURG; DEKA
INVESTMENT GmbH; and ETFLAB INVESTMENT
GmbH,

            Plaintiffs,

      v.

AMERICAN INTERNATIONAL GROUP, INC.;
MARTIN J. SULLIVAN; STEVEN J. BENSINGER;
JOSEPH CASSANO; ANDREW FORSTER; ALAN
FROST; DAVID HERZOG; ROBERT LEWIS;
MARSHALL A. COHEN; MARTIN S. FELDSTEIN;
ELLEN V. FUTTER; STEPHEN L. HAMMERMAN;
GEORGE L. MILES, JR.; MORRIS W. OFFIT;
JAMES F. ORR III; VIRGINIA ROMETTY;
MICHAEL H. SUTTON; EDMUND S.W. TSE;
FRANK G. ZARB; PRICEWATERHOUSECOOPERS
LLC;  CITIGROUP GLOBAL MARKETS INC.;
CREDIT SUISSE SECURITIES (USA) LLC;
DEUTSCHE BANK SECURITIES INC.;
DOWLING & PARTNERS SECURITIES, LLC; FOX-
PITT KELTON COCHRAN CARONIA WALLER
(USA) LLC; JP MORGAN SECURITIES INC.;
KEEFE, BRUYETTE & WOODS, INC.; MERRILL
LYNCH, PIERCE, FENNER & SMITH
INCORPORATED; and WACHOVIA CAPITAL
MARKETS LLC,

            Defendants.

PACIFIC LIFE FUNDS and PACIFIC SELECT
FUND,

                              Plaintiffs,                              No. 12 Civ. 6071 (LTS) (DCF)

              v.

AMERICAN INTERNATIONAL GROUP, INC.,
MARTIN J. SULLIVAN, STEVEN J. BENSINGER,
JOSEPH CASSANO, ANDREW FORSTER, ALAN
FROST, DAVID L. HERZOG, ROBERT LEWIS,
STEPHEN F. BOLLENBACH, MARSHALL A.
COHEN, MARTIN S. FELDSTEIN, ELLEN V.
FUTTER, STEPHEN L. HAMMERMAN,
RICHARD C. HOLBROOKE, FRED H.
LANGHAMMER, GEORGE L. MILES, JR.,
MORRIS W. OFFIT, JAMES F. ORR III, VIRGINIA
M. ROMETTY, MICHAEL H. SUTTON, EDMUND
S.W. TSE, ROBERT B. WILLUMSTAD, and
FRANK G. ZARB,

                              Defendants.


TEACHERS RETIREMENT SYSTEM OF THE
STATE OF ILLINOIS,

                              Plaintiff,                              No. 13 Civ. 3377 (LTS) (DCF)

              v.

AMERICAN INTERNATIONAL GROUP, INC.,
MARTIN J. SULLIVAN, STEVEN J. BENSINGER,
ROBERT E. LEWIS, JOSEPH J. CASSANO,
ANDREW FORSTER, ALAN FROST, and DAVID
L. HERZOG,

                              Defendants.

1220845.1

GIC PRIVATE LIMITED,

Plaintiff,

v.

AMERICAN INT'L GROUP, INC.,

Defendant.

No. 13 Civ. 6565 (LTS) (DCF)

THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA,

Plaintiff,

v.

AMERICAN INTERNATIONAL GROUP, INC.,
MARTIN J. SULLIVAN, STEVEN J. BENSINGER,
JOSEPH CASSANO, ANDREW FORSTER, ALAN
FROST, DAVID L. HERZOG, ROBERT LEWIS,

Defendants.

No. 14 Civ. 1270 (LTS) (DCF)

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' JOINT OMNIBUS
MOTION TO DISMISS ON TIMELINESS GROUNDS**

1220845.1

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................ 1

SUMMARY OF PLAINTIFFS' ALLEGATIONS ...................................... 3

     A.   AIG and the Section 10(b) Defendants Made a Continuing Series of Related Misrepresentations Throughout the Relevant Period. .............. 3

         1.   AIG's Exposure to the U.S. Housing Market ................................ 4

         2.   Defendants' Representations in 2006 ........................................... 5

         3.   Defendants' Representations in 2007 ........................................... 6

         4.   Defendants' Representations in 2008 ........................................... 9

     B.   Defendants' Statements Were False or Misleading. ............................... 10

ARGUMENT .................................................................................... 11

     I.   Plaintiffs Filed Their Cases Within Five Years Of The "Violation." ................. 11

        A.   The Five-Year Period Runs from the Date Defendants' Fraud Ended. ......................................................................................... 12

        B.   Neither *Merck* nor *Lampf* Forecloses Measuring the Five-Year Period from the Date the Fraud Ended. .......................................... 15

     II.   Plaintiffs' Claims Are Timely In Accordance With *American Pipe*. .................. 18

        A.   The Statutes of Repose Were Tolled While the Class Action Was Pending. ...................................................................................... 18

        B.   *IndyMac* Does Not Apply Here. ............................................................ 22

CONCLUSION ................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Am. Pipe & Constr. Co. v. Utah,*
  414 U.S. 538 (1974)..........................................................................3, 11, 20, 24

*Arnold v. KPMG LLP,*
  334 F. App'x 349 (2d Cir. 2009) ....................................................................... 14

*Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.,*
  778 F. Supp. 695 (S.D.N.Y. 1991)...................................................................... 12

*Crown, Cork & Seal Co. v. Parker,*
  462 U.S. 345 (1983)..................................................................................... 3, 20

*CTS Corp. v. Waldburger,*
  134 S. Ct. 2175 (2014).................................................................................. 2, 24

*Delaney v. Bank of Am. Corp.,*
  766 F.3d 163 (2d Cir. 2014).............................................................................. 14

*Devlin v. Scardelletti,*
  536 U.S. 1 (2002).............................................................................................. 18

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council,*
  485 U.S. 568 (1988).......................................................................................... 23

*Eisen v. Carlisle & Jacquelin,*
  417 U.S. 156 (1974)........................................................................................... 19

*Fed. Housing Fin. Agency v. UBS Ams. Inc.,*
  712 F.3d 136 (2d Cir. 2013).............................................................................. 22

*Goldenson v. Steffens,*
  802 F. Supp. 2d 240 (D. Me. 2011) ................................................................... 17

*Grondahl v. Merritt & Harris, Inc.,*
  964 F.2d 1290 (2d Cir. 1992)............................................................................. 14

*Herman & MacLean v. Huddleston,*
  459 U.S. 375 (1983)........................................................................................... 17

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.,*
  741 F. Supp. 2d 511 (S.D.N.Y. 2010)................................................................... 4

*In re Beacon Assocs. Litig.,*
  282 F.R.D. 315 (S.D.N.Y. 2012) ....................................................................... 12

*In re Comverse Tech., Inc., Sec. Litig.,*
  543 F. Supp. 2d 134 (E.D.N.Y. 2008) ............................................................... 14

TABLE OF AUTHORITIES
(continued)

Page

*In re Dynex Capital, Inc. Sec. Litig.*,
  No. 05 Civ. 1897 (HB), 2006 U.S. Dist. LEXIS 4988 (S.D.N.Y. Feb. 10, 2006),
  *vacated in part on other grounds sub nom.*,
  *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
  531 F.3d 190 (2d Cir. 2008)........................................................................ 12, 13, 14

*In re Exxon Mobil Corp. Sec. Litig.*,
  500 F.3d 189 (3d Cir. 2007)............................................................................. 16

*In re Merck & Co. Sec., Derivative & "ERISA" Litig.*,
  No. 11-6259 (SRC), 2012 U.S. Dist. LEXIS 180707 (D.N.J. Dec. 20, 2012)......................... 12

*In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*,
  810 F. Supp. 2d 650 (S.D.N.Y. Sept. 15, 2011) ....................................................... 24

*In re WorldCom Sec. Litig.*,
  496 F.3d 245 (2d Cir. 2007)........................................................................ 18, 25

*Int'l Shoe Co. v. Washington*,
  326 U.S. 310 (1945)................................................................................... 20

*Intesa v. Sanpaolo, S.p.A. v. Credit Agricole Corporate & Inv. Bank*,
  924 F. Supp. 2d 528 (S.D.N.Y. 2013)................................................................... 16

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
  501 U.S. 350 (1991) ............................................................................... 15, 16

*Merck & Co. v. Reynolds*,
  559 U.S. 633 (2010)............................................................................... 15, 16

*MPD Accessories B.V. v. Urban Outfitters*,
  No. 12 Civ. 6501 (LTS)(KNF), 2013 U.S. Dist. LEXIS 185351 (S.D.N.Y. Dec. 16, 2013) ... 18

*Mullane v. Cent. Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950)............................................................................... 19, 21

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)............................................................................. 20, 21, 25

*Plymouth Cnty. Ret. Ass'n v. Schroeder*,
  576 F. Supp. 2d 360 (E.D.N.Y. 2008) ................................................................... 13

*Police & Fire Ret. Sys. of Detroit v. IndyMac MBS, Inc.*,
  721 F.3d 95 (2d Cir. 2013), *cert. granted sub nom.*,
  *Pub. Emps.' Ret. Sys. of Miss. v. IndyMac MBS, Inc.*, 134 S. Ct. 1515 (2014),
  *cert. dismissed*, 135 S. Ct. 42 (2014) ........................................................ 3, 17, 22, 23

*Semerenko v. Cendant Corp.*,
  223 F.3d 165 (3d Cir. 2000)........................................................................... 14

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010) .................................................................................. 24, 25

*Shalam v. KPMG*,
No. 05 CV 3602 (HB), 2005 U.S. Dist. LEXIS 18989 (S.D.N.Y. Sept. 6, 2005) ................... 14

*Smith v. Bayer Corp.*,
131 S. Ct. 2368 (2011) ............................................................................... 25

*Take-Two Interactive Software, Inc. v. Brant*,
No. 06 Civ. 05279 (LTS), 2010 U.S. Dist. LEXIS 32120 (S.D.N.Y. Mar. 31, 2010).... 2, 13, 14

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506 (S.D.N.Y. Sept. 6, 2005) .......... 12, 18

*Wal-Mart Stores, Inc. v. Dukes*,
131 S. Ct. 2541 (2011) ............................................................................... 18

*Winters v. Stemberg*,
529 F. Supp. 2d 237 (D. Mass. 2008) ......................................................... 12

**Statutes**

15 U.S.C. § 77m ...................................................................................... 11, 22

28 U.S.C. § 1658(b) ................................................................................. *passim*

28 U.S.C. § 2072(b) ................................................................................. 22

**Rules**

2d Cir. L.R. 32.1.1 ................................................................................... 14

Fed. R. Civ. P. 23 ................................................................................... 22, 24, 25

1220845.1

## PRELIMINARY STATEMENT

Between November 18, 2011 and September 16, 2013, Plaintiffs—who until recently were members of the putative class in *In re American International Group, Inc. 2008 Securities Litigation* (the "Class Action")—filed these individual actions for damages resulting from Defendants' misstatements and omissions regarding AIG's exposure to risks in the market for subprime mortgages.  From March 16, 2006 to September 16, 2008 (the "Relevant Period"), Defendants represented to investors and others that AIG's investments in credit default swaps ("CDSs") tied to collateralized debt obligations ("CDOs") and securities whose underlying collateral consisted of subprime mortgages reflected sound, secure risk-assessment by Defendants.  Defendants further stated the Company was well-positioned to withstand even a "depression"-level downturn in the housing market.  In fact, (1) Defendants did not employ extensive due diligence before entering into swap contracts; (2) AIG's CDS portfolio was subject to the significant, undisclosed risk that the Company could be required to make tens of billions of dollars in collateral postings if the underlying CDOs declined in value due to a downturn in the housing market; (3) AIG's investments in residential-mortgage-backed securities ("RMBS") also bore the undisclosed risk that a declining housing market would drive down the value of those securities, rendering them less liquid than traditional securities-lending investments and exposing the Company to a "run" on the cash collateral underlying the RMBS; and (4) the Company was suffering from a severe strain on its liquidity due to the poor performance of those investments.  The concealed facts were not fully revealed to the market until after trading closed on September 16, 2008, when the U.S. government's $85 billion bailout of AIG was disclosed.

Defendants do not contend they lacked notice of Plaintiffs' claims; indeed, Defendants view these complaints as "near carbon copies" of the class complaint.  Defs.' Omnibus Br. 2. Rather, Defendants contend these claims are barred, in whole or in part, by the three- and five-

year statutes of "repose" in Section 13 of the Securities Act and 28 U.S.C. § 1658(b), respectively.  Dismissal is unwarranted, for at least two reasons:

*First*, Plaintiffs filed their Exchange Act claims within five years of the "violation," as prescribed by Section 1658(b).  Because the "violation" here consists of a series of related, continuing misstatements and omissions "made by a single entity speaking as such or by a static group of speakers acting in concert,"[1] the five-year period commenced when the alleged fraud ceased on September 16, 2008.  Measuring the five-year period from the date the fraud ended accords with the statute's text, as well as the Supreme Court's recent instruction that "[a] statute of repose . . . is measured not from the date on which the claim accrues but instead from the date of *the last culpable act or omission of the defendant*."  *CTS Corp. v. Waldburger*, 134 S. Ct. 2175, 2182 (2014).[2]  It is also consistent with the objective of a statute of repose to provide a point at which a defendant "should be able to put *past events* behind him."  *Id.* at 2183.  Where, as here, a fraud began more than five years before a plaintiff's complaint was filed and continued within five years of the filing date, the events constituting the violation are not "past" such that defendants are statutorily entitled to "repose."  As Plaintiffs' complaints were all filed on or before September 16, 2013, within five years of the "violation," they are timely.[3]

---

[1] *Take-Two Interactive Software, Inc. v. Brant*, No. 06 Civ. 05279 (LTS), 2010 U.S. Dist. LEXIS 32120, at *19 (S.D.N.Y. Mar. 31, 2010) (Swain, J.).

[2] Unless stated otherwise, emphasis has been added, and internal citations, quotation marks, and footnotes omitted.

[3] Plaintiffs' operative complaints are cited as follows:  (i) for the *Kuwait Investment Authority* action (commenced November 18, 2011, amended complaint filed September 10, 2012), "Kuwait ¶ __"; (ii) for the *Oppenheimer* action (commenced January 20, 2012, amended complaint filed June 26, 2012), "Opp. ¶ __"; (iii) for the *British Coal Staff Superannuation Scheme, et al.* action (commenced June 11, 2012, corrected complaint filed July 9, 2012), "Brit. Coal ¶ __"; (iv) for the *Pacific Life Funds, et al.* action (commenced August 8, 2012, amended complaint filed January 20, 2015), "Pac. Life ¶ __"; (v) for the *Teachers Retirement System of the State of Illinois* action (commenced May 17, 2013), "TRSI ¶ __"; (vi) for the *Regents of the University of California* action (commenced August 6, 2013), "Regents ¶ __"; and (vii) for the *GIC Private Limited* action (commenced September 16, 2013), "GIC ¶ __."  Defendants seek dismissal of each plaintiff's Exchange Act claims to the extent they are based on misstatements or omissions made more than five years before plaintiff filed its individual action.  Even under Defendants' erroneous interpretation of Section 1658(b), nearly all plaintiffs would retain some portion of their claims, and a number of plaintiffs (including in the *Kuwait*, *Oppenheimer*, *British Coal*, and *Pacific Life* actions) would retain a large portion of their claims.

1220845.1

*Second*, the statutes of repose for Plaintiffs' Securities Act and Exchange Act claims were

tolled in accordance with *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974),

between May 21, 2008—when the initial class complaint was filed—and when Plaintiffs recently

opted out of the class.  The Second Circuit's ruling in *Police & Fire Retirement System of*

*Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95 (2d Cir. 2013), does not, as Defendants contend,

apply here.  Unlike in that case, where putative class members were denied intervention to assert

claims as to which the lead plaintiff lacked standing, Plaintiffs' claims were encompassed by the

class complaint until they opted out.  Applying *American Pipe* in these circumstances is

consonant with the repose statutes' purpose of eliminating Defendants' liability after a specified

period of time, as the extent of their liability after Plaintiffs opted out was the same as it was

before.  Tolling the statutes thus does not abridge or modify any "substantive right" of

Defendants to be free from liability, and so the Rules Enabling Act is not implicated.  Further,

dismissing Plaintiffs' claims would deprive them of *their* constitutionally mandated right to a

"meaningful" opportunity to opt out of the class and pursue their claims separately.  *See Crown,*

*Cork & Seal Co. v. Parker*, 462 U.S. 345, 351-52 (1983).  Defendants' motion must be denied.

## SUMMARY OF PLAINTIFFS' ALLEGATIONS

### A.     AIG and the Section 10(b) Defendants Made a Continuing Series of Related Misrepresentations Throughout the Relevant Period.[4]

Like lead plaintiff in the Class Action, Plaintiffs allege that AIG and the Section 10(b)

Defendants disseminated a series of misrepresentations designed to "conceal[] . . . either a

significant decision taken by the Company to expose itself to risk or a significant weakness in the

Company's risk controls that would have been viewed by the reasonable investor as having

---

[4] The "Section 10(b) Defendants" are Martin J. Sullivan, Steven J. Bensinger, Joseph Cassano, Andrew Forster, David L. Herzog, and Robert Lewis.  For purposes of this brief, "Defendants" refers collectively to AIG and the Section 10(b) Defendants (the *GIC* complaint, however, names only AIG as a defendant).

significantly altered the total mix of information made available." *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) ("*AIG*"). Defendants repeatedly assured investors and other market participants about the soundness of AIG's CDS portfolio, the diligence and prudence with which AIG's subsidiary American International Group Financial Products Corp. ("AIGFP") managed risks in connection with investments tied to the U.S. housing market, and the Company's resulting ability to withstand even the most severe financial crisis. Defendants' fraud consisted of numerous misstatements in, and omissions from, SEC filings, press releases, earnings calls, and other public statements, continuing unabated throughout the Relevant Period. Each Defendant made statements—during 2006, 2007, and/or 2008—that constructed the false narrative of a sound, secure AIG.[5] In fact, AIG was a house of cards that quickly tumbled as the residential-mortgage market deteriorated in 2008, ultimately necessitating a massive government bailout and leaving investors with billions in losses.

### 1.   AIG's Exposure to the U.S. Housing Market

Around 2004, AIG began writing CDSs on complex "multi-sector CDOs," which often packaged together 100 or more securities, each backed by pools of mortgages, auto loans, or credit-card receivables.[6] During 2005, AIG ramped up its writing of CDSs and increasingly concentrated its portfolio on U.S. residential mortgage loans, but the Company's oversight of AIGFP and the CDS business diminished.[7] Under the direction of AIG's CEO, Defendant Martin Sullivan, many risk controls were weakened or eliminated; at the same time, AIGFP's

---

[5] Plaintiffs' complaints specify the false or misleading statements made by each Defendant during the Relevant Period: (i) for statements by Sullivan in 2006, 2007, and 2008, *see, e.g.*, Kuwait ¶ 436; Regents ¶¶ 444-45; GIC ¶¶ 449-50; (ii) for statements by Bensinger in 2006, 2007, and 2008, *see, e.g.*, Kuwait ¶ 440; Regents ¶¶ 448-49; GIC ¶¶ 453-54; (iii) for statements by Herzog in 2006, 2007, and 2008, *see, e.g.*, Kuwait ¶ 442; Regents ¶ 450; (iv) for statements by Lewis in 2007, *see, e.g.*, Kuwait ¶ 443; Regents ¶ 451; GIC ¶ 456; (v) for statements by Cassano in 2006 and 2007, *see, e.g.*, Kuwait ¶ 450; Regents ¶ 458; GIC ¶ 463; (vi) for statements by Forster in 2007, *see, e.g.*, Kuwait ¶ 453; Regents ¶ 461; GIC ¶ 466. *See also* Opp. ¶¶ 457, 461, 463, 471, 474; Brit. Coal ¶¶ 138-291; Pac. Life ¶¶ 449, 453, 455, 462, 466; TRSI ¶¶ 113, 137, 141, 155-56, 180, 204, 247-48.

[6] Kuwait ¶ 9; Opp. ¶ 6; Brit. Coal ¶ 5; Pac. Life ¶ 6; TRSI ¶ 228(c); Regents ¶ 8; GIC ¶ 8.

[7] Kuwait ¶¶ 10-12; Opp. ¶ 7; Brit. Coal ¶ 7; Pac. Life ¶ 7; TRSI ¶¶ 5, 8-9; Regents ¶ 9; GIC ¶ 9.

president, Defendant Joseph Cassano, and a few others at AIGFP controlled the origination, valuation, and reporting functions for the CDS portfolio, and excluded key risk-management and accounting personnel.[8] By the end of that year, when AIG decided to cease writing CDSs on multi-sector CDOs due to AIGFP's concern that underwriting standards for subprime loans had deteriorated, the Company was insuring about $80 billion of those instruments.[9]

Around the same time, another AIG unit, AIG Investments, invested in RMBS and similar securities tied to subprime mortgages, mostly in connection with AIG's securities-lending program (through which AIG would lend securities to banks and brokers in exchange for cash collateral that the Company would then invest).[10] In late 2005, notwithstanding AIGFP's determination to stop writing CDSs for subprime-related CDOs, AIG set a target for investing up to 75% of the cash collateral received from borrowers in RMBS.[11]

      2.    **Defendants' Representations in 2006**

Defendants' fraud began on March 16, 2006, when AIG represented in its 2005 Form 10-K, *inter alia*, that "[t]he threshold amount of credit losses that must be realized before AIGFP has any payment obligation is negotiated by AIGFP for each transaction to provide that the likelihood of any payment obligation by AIGFP under each [CDS] transaction is *remote, even in severe recessionary market scenarios*."[12] The 10-K further highlighted AIG's valuation models and the guidelines established by the Company's Credit Risk Committee.[13]

---

[8] Kuwait ¶ 12; Opp. ¶ 7; Brit. Coal ¶ 103; Pac. Life ¶ 7; TRSI ¶¶ 56-60; Regents ¶ 9; GIC ¶ 9.

[9] Kuwait ¶ 11; Opp. ¶ 6; Brit. Coal ¶ 70; Pac. Life ¶ 6; TRSI ¶ 88; Regents ¶ 8; GIC ¶ 8.

[10] Kuwait ¶ 13; Opp. ¶ 8; Brit. Coal ¶ 12; Pac. Life ¶ 8; TRSI ¶¶ 102-03; Regents ¶ 10; GIC ¶ 10.

[11] Kuwait ¶ 14; Opp. ¶ 8; Brit. Coal ¶ 73; Pac. Life ¶ 8; TRSI ¶ 104; Regents ¶ 10; GIC ¶ 10.

[12] Kuwait ¶ 217; Opp. ¶ 243; Brit. Coal ¶ 144; Pac. Life ¶ 235; TRSI ¶ 110; Regents ¶ 225; GIC ¶ 223.

[13] Kuwait ¶¶ 219-20; Opp. ¶ 245; Brit. Coal ¶¶ 146-47; Pac. Life ¶ 237; TRSI ¶ 111; Regents ¶¶ 227-28; GIC ¶¶ 224-26.

-5-

During the rest of that year, Defendants also represented that AIG's due diligence process in selecting the assets underlying its CDSs was "rigorous" and that the Company closely monitored their performance.  AIG's 2005 Form 10-K, for example, stated "AIGFP *continually monitors the underlying portfolios* to determine whether the credit loss experience for any particular portfolio has caused the likelihood of AIGFP having a payment obligation under the transaction to be greater than super senior risk."[14]  Quarterly SEC reports throughout 2006 similarly represented that AIG was "*actively manag[ing] [its] exposures* to limit potential losses, while maximizing the rewards afforded by these business opportunities."[15]

### 3.     Defendants' Representations in 2007

Defendants' fraud continued throughout 2007, even as the U.S. housing market was showing signs of distress.  As in its 2005 Form 10-K, AIG represented in its 2006 Form 10-K, filed on March 1, 2007, that the prospect of AIGFP incurring any payment obligation from its CDS transactions was "remote, even in severe recessionary market scenarios," and that AIGFP diligently monitored the underlying portfolios.[16]  Similarly, while providing investors an overview of AIGFP's business on May 31, 2007, Defendant Andrew Forster, AIGFP's Executive Vice President of Asset Trading & Credit Products, represented that AIGFP operated its CDS business assuming "the worst recession I can imagine and . . . mak[ing] sure that I can withstand all of that."[17]  He added, "I have to say, given the conservatism . . . that we've built in these portfolios, we haven't had to do a huge amount of hedging over the years."[18]

---

[14] Kuwait ¶ 217; Opp. ¶ 243; Brit. Coal ¶ 144; Pac. Life ¶ 235; TRSI ¶ 110; Regents ¶ 225; GIC ¶ 223.

[15] Kuwait ¶ 231; Opp. ¶ 257; Brit. Coal ¶ 159; Pac. Life ¶ 249; TRSI ¶ 118; Regents ¶ 239; GIC ¶ 237.

[16] Kuwait ¶ 240; Opp. ¶ 266; Brit. Coal ¶ 171; Pac. Life ¶ 258; TRSI ¶ 121; Regents ¶¶ 248, 253; GIC ¶ 246.

[17] Kuwait ¶¶ 259-60; Opp. ¶ 285; Brit. Coal ¶ 190; Pac. Life ¶ 277; TRSI ¶ 131; Regents ¶ 267; GIC ¶ 265.

[18] Kuwait ¶ 259; Opp. ¶ 285; Brit. Coal ¶ 190; Pac. Life ¶ 277; TRSI ¶ 131; Regents ¶ 267; GIC ¶ 265.

In mid-2007, in response to rising delinquency rates plaguing the U.S. housing market, rating agencies began downgrading subprime RMBS such as those backing the CDOs insured by AIGFP.[19]   Defendants nonetheless continued to understate the risks AIG faced and to tout the Company's purportedly cautious approach to assessing investments tied to the housing market. In an August 8, 2007 press release, for example, the Company stated:  "We continue to be very comfortable with our exposure to the US residential mortgage market, both in our operations and our investment activities."[20]   During an August 9, 2007 earnings call, Defendant Robert Lewis, AIG's Senior Vice President and Chief Risk Officer, stated "none of the AIGFP deals have experienced any significant collateral deterioration," adding "we're talking about a very remote risk, which is defined and calculated not just by rating agency models but also by our own very rigorous internal models used on each deal AIGFP structures."[21]   He further emphasized that "[a]ll of AIGFP's deals are subjected to an *exceptional degree of due diligence* both at the inception of the deal and on a daily basis going forward."[22]   Lewis also touted the soundness of AIG's CDS portfolio, stating "we believe that it would take declines in housing values to *reach depression proportions*, along with default frequencies never experienced, before our AAA and AA investments would be impaired."[23]   He stressed the "very remote risk" associated with AIGFP's transactions involving multi-sector CDOs and noted the "very rigorous internal models used on each deal AIGFP structures."[24]   Cassano represented during the call that AIG's CDSs "are very much *handpicked*," that is, "[w]e are very much involved in the process of developing

---

[19] Kuwait ¶¶ 121, 278(d-e), 280, 282; TRSI ¶ 90; Regents ¶ 288.

[20] Kuwait ¶ 261; Opp. ¶ 287; Brit. Coal ¶ 193; Pac. Life ¶ 279; TRSI ¶ 136; Regents ¶ 269; GIC ¶ 267.

[21] Kuwait ¶ 272; Opp. ¶ 299; Brit. Coal ¶ 204; Pac. Life ¶ 291; TRSI ¶ 141; Regents ¶ 280; GIC ¶ 278.

[22] Kuwait ¶¶ 269, 272; Opp. ¶ 298; Brit. Coal ¶ 204; Pac. Life ¶ 290; TRSI ¶ 141; Regents ¶ 280; GIC ¶ 278.

[23] Kuwait ¶¶ 269, 270; Opp. ¶ 296; Brit. Coal ¶ 201; Pac. Life ¶ 288; TRSI ¶ 141; Regents ¶ 278; GIC ¶ 276.

[24] Kuwait ¶ 272; Opp. ¶ 299; Brit. Coal ¶ 204; Pac. Life ¶ 291; TRSI ¶ 141; Regents ¶ 280; GIC ¶ 278.

the portfolios."[25]  He added that "it is hard for us, without being flippant, to even see a scenario

within any kind of realm of reason that would see us losing $1 in any of those transactions."[26]

Defendants continued to disseminate false or misleading statements to investors during

the remainder of 2007.  During a September 11, 2007 analyst conference hosted by Lehman

Brothers, for example, Sullivan represented that AIG's CDS portfolio was "well structured,"

underwent "ongoing monitoring," and "enjoy[ed] significant protection from collateral

subordination."[27]  In an October 10, 2007 press release announcing quarterly financial results,

Sullivan, while acknowledging that conditions in the U.S. housing and credit markets had

negatively impacted AIG's results, maintained that "our active and strong risk management

processes helped contain the exposure."[28]  The release further represented that, notwithstanding

the estimated additional $550 million unrealized market-valuation loss incurred by AIG's CDS

portfolio through October 2007, "AIG continues to believe it is *highly unlikely* that AIGFP will

be required to make any payments with respect to these derivatives."[29]  During a November 8,

2007 earnings call, Sullivan stated "AIG does not expect to pay any losses on this carefully

structured and well-managed portfolio," and Lewis represented that "[d]espite recent rating

action and dislocation in the marketplace . . . [w]e continue to believe strongly that AIGFP will

not be required to make any payments on these derivatives."[30]  On December 5, 2007, Sullivan

stated that while AIGFP had "very large notional amounts of exposure" related to its super senior

CDS portfolio, "because this business is carefully underwritten and structured with very high

---

[25] Kuwait ¶¶ 269, 275; Opp. ¶ 301; Brit. Coal ¶ 207; Pac. Life ¶ 293; TRSI ¶ 141; Regents ¶ 283; GIC ¶ 281.

[26] Kuwait ¶¶ 269, 275; Opp. ¶ 471; Brit. Coal ¶ 207; Pac. Life ¶ 463; TRSI ¶ 141; Regents ¶ 283; GIC ¶ 281.

[27] Opp. ¶ 300; Pac. Life ¶ 292; TRSI ¶ 146; Regents ¶ 282; GIC ¶ 280; *see also* Kuwait ¶¶ 269, 274 (same comments during August 9, 2007 earnings call).

[28] Kuwait ¶ 279; Opp. ¶ 305; Brit. Coal ¶ 211; Pac. Life ¶ 297; TRSI ¶¶ 93, 150; Regents ¶ 287; *see also* GIC ¶ 285 (same comments in November 7, 2007 press release).

[29] Kuwait ¶¶ 279-80; Opp. ¶ 305; Brit. Coal ¶ 211; Pac. Life ¶ 297; TRSI ¶ 150; Regents ¶ 287; GIC ¶¶ 285-86.

[30] Kuwait ¶¶ 287-88; Opp. ¶ 314; Brit. Coal ¶ 222; Pac. Life ¶ 306; TRSI ¶ 155; Regents ¶¶ 295, 296; GIC ¶ 294.

attachment points to the multiples of expected losses, we believe the probability that it will sustain an economic loss is close to zero."[31]  He also emphasized AIG's "rigorous due diligence" and "risk management culture," and further described the Company's exposure to the U.S. residential housing market as "manageable."[32]

### 4.   Defendants' Representations in 2008

Defendants continued to conceal material information regarding AIG's CDS portfolio through much of 2008, even after the Company disclosed on February 11, 2008 that its auditor PricewaterhouseCoopers ("PwC") had identified "a material weakness in [AIG's] internal control over financial reporting and oversight relating to the fair value valuation of the AIGFP super senior credit default swap portfolio."[33]  Defendants continued to reassure investors that the risk of loss on AIG's CDS portfolio was remote.  AIG represented in a February 28, 2008 press release that it "believe[d] that any credit impairment losses realized over time by AIGFP w[ould] not be material to AIG's consolidated financial condition" and that, except  to the extent of any such losses, the Company "expect[ed] AIGFP's unrealized market valuation losses to reverse over the remaining life of the super senior credit default swap portfolio."[34]  The next day, while delivering news of AIG's $11.25 billion writedown for unrealized losses from CDSs, AIG's CFO, Defendant Steven Bensinger, assured investors that AIGFP was confident it would not incur further material losses because it "underwrote its Super Senior credit derivative business to a *zero loss standard*, incorporating *conservative stress scenarios* at inception."[35]

---

[31] Kuwait ¶ 294; Opp. ¶ 320; Brit. Coal ¶ 228; Pac. Life ¶ 312; TRSI ¶ 156; Regents ¶ 302; GIC ¶ 300.

[32] Kuwait ¶ 296; Opp. ¶ 322; Brit. Coal ¶ 229; Pac. Life ¶ 314; TRSI ¶ 156; Regents ¶¶ 303, 304; GIC ¶¶ 302, 450.

[33] Kuwait ¶ 153; Opp. ¶ 341; Brit. Coal ¶ 243; Pac. Life ¶ 333; TRSI ¶ 171; Regents ¶ 323; GIC ¶ 321.

[34] Kuwait ¶¶ 335-36; Opp. ¶ 344; Brit. Coal ¶ 246; Pac. Life ¶ 336; TRSI ¶¶ 174, 180; Regents ¶ 326; GIC ¶ 324.

[35] Kuwait ¶¶ 335-36; Opp. ¶ 364; Brit. Coal ¶ 262; Pac. Life ¶ 356; TRSI ¶ 180; Regents ¶ 346; GIC ¶ 344.

Even as AIG revealed large losses related to its CDS portfolio in its May 8, 2008 Form 10-Q, Defendants continued to assure investors about the Company's financial soundness.  On a May 9, 2008 earnings call, for example, Bensinger stated that while the fair value of the CDSs under GAAP constituted the Company's best estimate of the fair value of the underlying CDOs, "the substantial risk that AIGFP covers for the CDO investors is the risk of suffering actual realized losses, not the variance in fair value of the CDOs," adding "AIGFP has structured its Super Senior credit default swap portfolio to withstand considerable stress."[36]  On May 20, 2008, speaking at an investor conference in London, Sullivan stated AIG was planning to raise $20 billion in capital to fortify its "fortress balance sheet" and enhance financial flexibility.[37]  Even after AIG posted record losses for the second quarter of 2008, Defendants represented that the Company could withstand market disruption.  Indeed, Bensinger stated during an August 7, 2008 analyst call—just six weeks before the bailout was announced—that AIG's capital position "is stronger today than it was at the end of the first quarter" and "is sound."[38]

> **B.**   **Defendants' Statements Were False or Misleading.**

Defendants' statements during the Relevant Period were false or misleading, and caused the price of AIG shares to be artificially inflated.  As in the Class Action, Plaintiffs allege that:

- Defendants "knew, beginning in 2005, that the Company had acquired billions of dollars' worth of exposure to RMBS through the CDS portfolio," and that, "while their model could not properly evaluate the extent of the related risk, the portfolio carried considerable valuation risk and collateral risk as well as credit risk";

- Defendants "knew that risk controls had been weakened at AIGFP";

- Defendants "deliberately declined, nonetheless, to disclose these risks";

---

[36] Kuwait ¶ 345; Opp. ¶ 373; Brit. Coal ¶ 270; Pac. Life ¶ 365; TRSI ¶ 193; Regents ¶ 355; GIC ¶ 353.

[37] Kuwait ¶¶ 168-69; TRSI ¶ 196; Regents ¶ 374; GIC ¶¶ 167, 372.

[38] Kuwait ¶ 369; Opp. ¶ 398; Brit. Coal ¶ 286; Pac. Life ¶ 390; TRSI ¶ 204; Regents ¶ 382; GIC ¶ 380.

- Defendants "similarly declined to disclose the risk presented by the Company's aggressive expansion into RMBS through the securities lending program";

- "As the investment community became increasingly alarmed by the subprime mortgage crisis," Defendants "continued to proclaim—through their public filings, conference calls with the investment community, and press releases—their confidence that the CDS portfolio only presented 'remote risk' and that the Company's controls were adequate to evaluate that risk"; and

- Defendants did so "despite various internal indicators to the contrary, including the Company's recognition of the weakness of the Gorton model [i.e., a risk-assessment model developed by Gary Gorton]; the resignation of [Joseph] St. Denis [a former Assistant Chief Accountant at the SEC's Enforcement Division whom AIG had hired in June 2006 as Vice President of Accounting Policy]; PwC's warning of a potential material weakness; and the multi-billion dollar collateral calls received from AIGFP's CDS counterparties." *AIG*, 741 F. Supp. 2d at 533.

Defendants' fraud ended when, after trading closed on September 16, 2008, AIG issued a press release announcing the $85 billion government bailout of the Company.[39]  The next day, AIG's share price dropped 46%, from $3.75 to $2.05.[40]

## ARGUMENT

### I.   Plaintiffs Filed Their Cases Within Five Years Of The "Violation."

To be timely, Section 10(b) claims must be brought within the earlier of "2 years after the discovery of the facts constituting the violation" or "5 years after such violation."  28 U.S.C. § 1658(b).[41]  Defendants do not challenge Plaintiffs' claims under the two-year statute, which indisputably was tolled in accordance with *American Pipe*.  Defendants assert, however, that (i) the five-year "statute of repose" has expired and (ii) it is not subject to the *American Pipe* rule. They are wrong on both counts.

---

[39] Kuwait ¶ 490; Opp. ¶ 510; Brit. Coal ¶ 359; Pac. Life ¶ 502; TRSI ¶ 217; Regents ¶ 497; GIC ¶ 501.

[40] Kuwait ¶ 491; Opp. ¶ 511; Brit. Coal ¶ 359; Pac. Life ¶ 503; TRSI ¶ 356; Regents ¶ 498; GIC ¶ 502.

[41] Plaintiffs in *Oppenheimer*, *British Coal*, and *Pacific Life* assert, in addition to Exchange Act claims, claims under the Securities Act of 1933 ("Securities Act").  The three-year repose period in Section 13 of the Securities Act runs from the date the subject securities were bona fide offered to the public or sold.  *See* 15 U.S.C. § 77m.  The offerings and sales from which those Plaintiffs' claims arise occurred more than three years before they filed their cases.  As detailed in Section II. below, however, those claims are timely in accordance with *American Pipe*.

## A.      The Five-Year Period Runs from the Date Defendants' Fraud Ended.

The Supreme Court recently explained that "[a] statute of repose . . . puts an outer limit

on the right to bring a civil action," measured "not from the date on which the claim accrues but

instead from the date of *the last culpable act or omission of the defendant*."  *CTS*, 134 S. Ct. at

2182.  That directive is consistent with the holdings by numerous courts that the five-year period

for Section 10(b) claims runs from the date the defendant ceased misstating or omitting the

material facts at issue.  *See, e.g.*, *In re Beacon Assocs. Litig.*, 282 F.R.D. 315, 324-25 (S.D.N.Y.

2012).[42]  Here, Defendants' "violation" consisted of a series of misstatements and omissions that

continued until September 16, 2008, within five years of when the last of the complaints was

filed.[43]  Plaintiffs' claims are therefore timely in their entirety.

Judge Baer's ruling in *In re Dynex Capital, Inc. Securities Litigation*,[44] which involved

Exchange Act claims based on alleged misrepresentations regarding asset-backed bonds, is on

point.  Defendants contended the five-year statute barred plaintiffs' claims to the extent they

arose from alleged misstatements or omissions in the bond-offering documents, which were

issued in 1999, and any other misrepresentations made more than five years before plaintiffs

brought suit on February 7, 2005.  *Id.* at *13 & n.3.  Judge Baer rejected that argument,

explaining that where "a series of fraudulent misrepresentations is alleged," the five-year period

---

[42] *Accord Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, No. 05 Civ. 1898 (SAS), 2005 U.S. Dist. LEXIS 19506, at *19 (S.D.N.Y. Sept. 6, 2005) ("*Teamsters Local 445*") ("The period of repose begins when the last alleged misrepresentation was made."); *Borden, Inc. v. Spoor Behrins Campbell & Young, Inc.*, 778 F. Supp. 695, 699 (S.D.N.Y. 1991) (repose period runs from the "most recent violation of Section 10(b) of which plaintiff complains").  Courts in other jurisdictions have similarly applied the five-year statute.  *See, e.g.*, *In re Merck & Co. Sec., Derivative & "ERISA" Litig.*, No. 11-6259 (SRC), 2012 U.S. Dist. LEXIS 180707, at *36 (D.N.J. Dec. 20, 2012); *Winters v. Stemberg*, 529 F. Supp. 2d 237, 246-47 (D. Mass. 2008).

[43] As Defendants concede (at 10), the last alleged misstatement was made on August 7, 2008, within five years of the filing of every action except *GIC*.  *See, e.g.*, Kuwait ¶ 369; Opp. ¶ 398; Brit. Coal ¶ 285; Pac. Life ¶ 390; TRSI ¶ 204; Regents ¶ 382.  Defendants also continued to omit material facts until September 16, 2008, five years before *GIC* was filed.  *See, e.g.*, GIC ¶¶ 22-25, 182, 501.

[44] No. 05 Civ. 1897 (HB), 2006 U.S. Dist. LEXIS 4988 (S.D.N.Y. Feb. 10, 2006), *vacated in part on other grounds sub nom.*, *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190 (2d Cir. 2008).

-12-

"begins when the last alleged misrepresentation was made." *Id.* at 13.  Because plaintiff alleged

"that the misrepresentations contained in the offering documents were followed by additional

materially false statements regarding the same subject matter," any claims arising from the 1999

offering documents "[we]re not barred by the five year limitations period." *Id.* at *14.  Other

courts have similarly interpreted the statute.[45]

      As in those cases, the numerous misstatements and omissions Defendants disseminated to

investors during the Relevant Period related to the same set of issues and conveyed the consistent

message that Defendants were attuned to the risks attendant to AIG's investments in the

subprime-mortgage market and had fortified the Company with sufficient safeguards to

withstand even the most severe financial disruption.  *See supra* pp. 4-11.  As Defendants knew or

recklessly disregarded, however, that was far from the truth.  *Id.*  The "violation" here, then, is

the series of related misstatements and omissions constituting Defendants' fraud, which ended

when the bailout was disclosed after trading closed on September 16, 2008.

      Indeed, this Court has indicated that the five-year period may run from the last in a series

of misrepresentations where, as here, they were "made by a single entity speaking as such or by a

static group of speakers acting in concert." *Take-Two*, 2010 U.S. Dist. LEXIS 32120, at *19.  In

*Take-Two*, the Court deemed the last-misrepresentation approach "potentially viable to preserve

*all* of [plaintiff]'s Section 10(b) misrepresentation claims" against defendants who allegedly

"made misrepresentations that continued into the period covered by the five-year statute of

repose." *Id.* at *20-21.  The Court "prefer[red] to await further development of the record and of

---

[45] *See, e.g.*, *Plymouth Cnty. Ret. Ass'n v. Schroeder*, 576 F. Supp. 2d 360, 378 (E.D.N.Y. 2008) (holding that "the five year statute of repose first runs from the date of the last alleged misrepresentation regarding related subject matter," and noting the alleged misrepresentations defendants made within the five years preceding suit bore a "factual nexus" to those they made earlier).

the parties' legal positions on this issue" before determining whether claims based on the earlier

misrepresentations were timely.  *Id.* at *21.[46]

Plaintiffs submit that in light of their allegations, Defendants cannot sustain their burden

to obtain dismissal.  At the very least, the Court should await further development of the facts to

determine whether to measure the five-year period from the date Defendants' fraud ended.[47]

Discovery, including expert analysis, may bear on, for example, whether the price impact of

misrepresentations made more than five years before Plaintiffs filed suit continued within five

years of filing, thus providing yet another basis to uphold claims based on those earlier

misrepresentations.[48]  That determination is not appropriate at the pleading stage.[49]

---

[46] *Accord In re Comverse Tech., Inc., Sec. Litig.*, 543 F. Supp. 2d 134, 155 (E.D.N.Y. 2008).

[47] The unpublished summary order in *Arnold v. KPMG LLP*, 334 F. App'x 349 (2d Cir. 2009), does not foreclose this application of Section 1658(b).  As an initial matter, the order is non-precedential.  *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 168 n.2 (2d Cir. 2014) (per curiam) ("pursuant to Local Rule 32.1.1, a summary order is not citable as precedent").  Notably, this Court's ruling in *Take-Two* postdates *Arnold*.  Further, *Arnold* was not a fraud-on-the-market case; nor was *Grondahl v. Merritt & Harris, Inc.*, 964 F.2d 1290 (2d Cir. 1992), which *Arnold* cites.  Those decisions thus do not speak to circumstances where, as here, plaintiffs' claims arise from a series of misrepresentations that potentially impacted the price of a publicly traded security both before and within five years of when suit was filed.  Additionally, in *Dynex Capital*, Judge Baer distinguished *Shalam v. KPMG*, No. 05 CV 3602 (HB), 2005 U.S. Dist. LEXIS 18989 (S.D.N.Y. Sept. 6, 2005), in which he had relied on *Grondahl*.  Plaintiff in *Shalam*, unlike plaintiff in *Dynex Capital*, "engaged in the sole relevant sale of securities more than five years before the complaint was filed."  *Dynex Capital*, 2006 U.S. Dist. LEXIS 4988, at *14 n.4.  Finally, were the Court to conclude that *Arnold* controls, Plaintiffs would still have timely claims based on their purchase dates:  All Plaintiffs made purchases within five years of filing their respective actions (while some plaintiffs do not specify transaction dates in their complaints, they provided that information with their requests for exclusion from the class and are prepared to provide it to the Court, either through a submission in connection with their oppositions to Defendants' motions to dismiss or by amending the complaints, if necessary).

[48] *See, e.g., Semerenko v. Cendant Corp.*, 223 F.3d 165, 185 (3d Cir. 2000) ("In the absence of a correction in the market price, the cost of the alleged misrepresentation is still incorporated into the value of the security and may be recovered at any time simply by reselling the security at the inflated price.").  For the same reason, Defendants' contention that Plaintiff U.C. Regents' claims against Martin Sullivan must be dismissed in their entirety because Regents filed its case more than five years after he resigned from AIG is unavailing.  Given Regents' allegations that misrepresentations by Sullivan (and others) during the Relevant Period caused the price of AIG shares to be artificially inflated until September 17, 2008 (*e.g.*, Regents ¶¶ 473-99), the Court can plausibly infer that Sullivan's misrepresentations continued to impact the share price even after he left the Company, thereby rendering those misrepresentations part of the "violation" that persisted until September 16, 2008.  Further, allowing Sullivan to escape liability for a fraud that he helped initiate and perpetuate for much of the Relevant Period, and which continued for a few months after he left AIG, would not promote the five-year statute's objective to afford repose for "past events."  *See CTS*, 134 S. Ct. at 2183.

[49] *See AIG*, 741 F. Supp. 2d at 534 (complaint "adequately plead[ed] that many of the principal risks concealed by AIG and the Section 10(b) Defendants' material misstatements and omissions—such as the threat posed to the Company's liquidity by the CDS portfolio's collateral risk—subsequently materialized to Plaintiffs' detriment").

1220845.1

B.      **Neither _Merck_ nor _Lampf_ Forecloses Measuring the Five-Year Period from the Date the Fraud Ended.**

Defendants assert that measuring the five-year period from the date the alleged fraud ended would run afoul of _Merck & Co. v. Reynolds_, 559 U.S. 633 (2010), and _Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson_, 501 U.S. 350 (1991).  But neither _Merck_ nor _Lampf_ contemplates, much less demands, the cramped reading of Section 1658(b) Defendants advocate.

_Merck_ directs that Section 1658(b)'s two-year period cannot commence until plaintiff "discover[s]" scienter-related facts.  559 U.S. at 648.  The Court referenced the five-year provision in disposing of defendants' concern that requiring discovery of scienter would "give life to stale claims or subject defendants to liability for acts taken long ago."  _Id._ at 650. Nowhere did the Court reject the principle that the "violation" triggering the five-year period can consist of a series of related misrepresentations, and that the period begins when the fraud ends.

Indeed, _Merck supports_ this interpretation of the statute.  Analyzing the two-year period in Section 1658(b)(1), which commences upon "discovery of the facts constituting the violation," the Court instructed that "th[e] 'fact' of scienter 'constitut[es]' an important and necessary element of a § 10(b) 'violation.'"  559 U.S. at 648 (second alteration in original).  The Court cited, _inter alia_, the PSLRA's requirement that plaintiffs "'state with particularity _facts_ giving rise to a strong inference that the defendant acted with the required state of mind.'"  _Id._ at 649 (emphasis in original) (quoting 15 U.S.C. § 78u-4(b)(2)).  Scienter often, as here, flows from multiple "facts" that render misstatements or omissions actionable.[50]  In such cases, "discovery" of those facts refers to the revelation of defendants' fraudulent scheme, not a particular

---

[50] _See AIG_, 741 F. Supp. 2d at 533 (holding that lead plaintiff sufficiently alleged that AIG, Sullivan, Bensinger, Cassano, Forster, Herzog, and Lewis reassured investors about the Company's CDS portfolio and controls "despite various internal indicators to the contrary, including the Company's recognition of the weakness of the Gorton model; the resignation of St. Denis; PwC's warning of a potential material weakness; and the multi-billion dollar collateral calls received from AIGFP's CDS counterparties").

misrepresentation.[51]  Accordingly, where, as here, the alleged fraud consists of numerous
knowing or reckless misrepresentations comprising a single fraudulent scheme, measuring
Defendants' "violation," as used in Section 1658(b)(2), from each misrepresentation rather than
from the date the fraud ended would accord the term "violation" two different meanings within
the same statute—"a significant textual mountain to climb."  *In re Exxon Mobil Corp. Sec. Litig.*,
500 F.3d 189, 201 n.15 (3d Cir. 2007) (interpreting Section 1658(b)).

    *Lampf*, too, is inapposite.  The Supreme Court held there that the "discovery rule" did not
apply to the three-year repose provision then applicable to Section 10(b) claims.  501 U.S. at
363.  The Court explained that the then-applicable one-year statute of limitations, which
expressly incorporated the discovery rule, would be superfluous if the three-year period was also
subject to tolling based on discovery.  *Id.*  Measuring the five-year period from the date the fraud
ended, on the other hand, does not render the two-year period superfluous, because actions
commenced more than five years after the last of a series of related misrepresentations are still
barred even if the plaintiff has not yet "discovered" the fraud.[52]  Nor does this application of the
statute diminish the certainty it aims to provide:  Defendants obtain no less "repose" than they
would by measuring the "violation" from the date of each misrepresentation.

    This interpretation of the statute does not, as Defendants contend, equate to equitable
tolling.  Equitable tolling applies "when a litigant has pursued his rights diligently but some
extraordinary circumstance prevents him from bringing a timely action."  *CTS*, 134 S. Ct. at
2183.  Measuring the five-year period from the date the fraud ended does not turn on the
plaintiff's knowledge or diligence, and thus "does not violate the *Lampf* Court's conclusion that

---

[51] *See, e.g.*, *Merck*, 559 U.S. at 653-54 (holding that FDA warning letter "shows little or nothing about the here-relevant scienter, i.e., whether Merck *advanced the naproxen hypothesis with fraudulent intent*").

[52] *See Intesa v. Sanpaolo, S.p.A. v. Credit Agricole Corporate & Inv. Bank*, 924 F. Supp. 2d 528, 534-38 (S.D.N.Y. 2013) (Section 10(b) claims time-barred where five-year period had run but two-year period had not).

principles of equitable tolling do not apply to § 1658(b)." *Goldenson v. Steffens*, 802 F. Supp. 2d 240, 259 (D. Me. 2011). This application of the statute "does not allow a claim to go forward more than five years after a defendant's final violation"; rather, "when a defendant has committed a violation within the repose period, it allows a plaintiff to hold the defendant accountable for previous violations that are part of the same scheme." *Id.*

The Second Circuit's ruling in *IndyMac* that if the *American Pipe* rule constitutes equitable tolling, *Lampf* prohibits its application to the Securities Act's three-year statute, is likewise inapposite. *See IndyMac*, 721 F.3d at 109. That decision says nothing about when Section 1658(b)'s five-year period commences.

Defendants also assert (at 11-12) that measuring the five-year period from the last misrepresentation would be "unjust" and result in a "windfall" to Plaintiffs. To the contrary, it would be unjust *not* to apply Section 1658(b) in this way in light of Plaintiffs' allegations that Defendants' repeated misstatements and omissions on the same issues throughout the Relevant Period are all "part of the same scheme." *See Goldenson*, 802 F. Supp. 2d at 259. Interpreting the "violation" as Defendants urge would shield them from liability for part of an ongoing fraud that ended less than five years before Plaintiffs filed suit, and would provide an incentive for corporate actors to perpetuate fraudulent schemes—likely exacerbating the effects of their malfeasance on investors—by simply "waiting out" the statute. That is contrary to the Exchange Act's objective of protecting investors from misconduct, and it is unlikely that Congress, which promulgated Section 1658(b) in the wake of the Enron and WorldCom scandals, intended the five-year provision to operate in that manner.[53] Further, as Defendants have been on notice of the scope of the claims brought against them since the Class Action's inception in May 2008,

---

[53] *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 386-87 (1983) (securities laws "should be construed not technically and restrictively, but flexibly to effectuate [their] remedial purposes") (alteration in original).

-17-

there is no "unfairness" in declining to dismiss Plaintiffs' complaints, which Defendants regard

as "near carbon copies" of the class complaint.  Defendants' contention (at 12) that Plaintiffs'

reliance on the alleged misrepresentations was "unreasonable" is likewise unavailing, as the

timeliness of Plaintiffs' claims is distinct from the issue of reliance.[54]  Nor do Defendants

challenge Plaintiffs' claims on reliance grounds.

In sum, Plaintiffs' claims were timely asserted within five years of the "violation."[55]

## II.   **Plaintiffs' Claims Are Timely In Accordance With _American Pipe_.**[56]

### A.   **The Statutes of Repose Were Tolled While the Class Action Was Pending.**

Plaintiffs' Securities Act and Exchange Act claims are timely in accordance with

_American Pipe_ and later decisions.  Under _American Pipe_, "class members are treated as parties

to the class action 'until and unless they received notice thereof and chose not to continue.'"

_In re WorldCom Sec. Litig._, 496 F.3d 245, 255 (2d Cir. 2007) (quoting _Am. Pipe_, 414 U.S. at

551).[57]  The repose periods were therefore suspended while Plaintiffs were in the class.[58]

The Supreme Court has repeatedly recognized that "[i]n the context of a class action

predominantly for money damages . . . absence of notice and opt-out violates due process."

_Wal-Mart Stores, Inc. v. Dukes_, 131 S. Ct. 2541, 2559 (2011).  A series of rulings over the past

four decades has reaffirmed the importance of affording class members a _meaningful_ right to opt

---

[54] _Teamsters Local 445_, 2005 U.S. Dist. LEXIS 19506, at *56 n.153 (a "truth on the market" defense imposes a "higher standard" than does inquiry notice).

[55] Defendants' argument (at 10) for dismissal of Plaintiffs' "control person" claims under Section 20(a) of the Exchange Act turns solely on their assertion that the underlying Section 10(b) claims are time-barred.  Because Plaintiffs' Section 10(b) claims are timely in their entirety, so are their Section 20(a) claims.

[56] With respect to Plaintiffs' Exchange Act claims, the discussion below assumes, purely for argument's sake, that Plaintiffs' claims would not be timely based on when the five-year period commenced.

[57] _See also Devlin v. Scardelletti_, 536 U.S. 1, 10 (2002) ("Nonnamed class members are . . . parties in the sense that the filing of an action on behalf of the class tolls a statute of limitations against them.") (citing _Am. Pipe_).

[58] Defendants do not dispute that the limitations periods for Plaintiffs' common-law claims were tolled during the pendency of the Class Action.  Defendants have therefore waived any argument to the contrary.  _See MPD Accessories B.V. v. Urban Outfitters_, No. 12 Civ. 6501 (LTS)(KNF), 2013 U.S. Dist. LEXIS 185351, at *6 n.4 (S.D.N.Y. Dec. 16, 2013) (Swain, J.) ("[A]rguments may not be made for the first time in a reply brief.").

out and pursue their claims, even where their claims would be untimely but for the existence of a
class action in which they were members of the putative class.

In *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974), the Court held that the plaintiff,
who asserted antitrust and securities claims on behalf of himself and a class of six million, had to
bear the cost of individual notice to the class, notwithstanding his mere $70 stake in the
litigation.  *Id.* at 166-68.  The Court thus rejected the modified notification process the district
court had adopted, which shifted much of the notice cost to the defendant.  The Court relied on,
*inter alia*, the Advisory Committee's Note to Rule 23, which states the notice provision of
subdivision (c)(2) is "'not merely discretionary'" and is "'designed to fulfill requirements of due
process to which the class action procedure is of course subject'" (*id.* at 173 (quoting Adv.
Comm. Note)), as well as the Court's directive in *Mullane v. Central Hanover Bank & Trust Co.*,
339 U.S. 306 (1950), that "'when notice is a person's due, process which is a mere gesture is not
due process.'"  *Eisen*, 417 U.S. at 174 (quoting *Mullane*, 339 U.S. at 315).  Plaintiff's assertion
that individual notice was "unnecessary" because class members' small stakes in the case meant
they "lack[ed] any incentive to opt out of the class action even if notified" was therefore
misplaced.  *Id.* at 176.  Rather, because Rule 23 "was intended to insure that the judgment,
whether favorable or not, would bind all class members who did not request exclusion from the
suit," each class member who can be identified through reasonable effort "must be notified that
he may request exclusion from the action *and thereby preserve his opportunity to press his claim
separately* or that he may remain in the class."  *Id.*

Plaintiff further contended class members would not opt out "because the statute of
limitations ha[d] long since run out on" their claims.  *Id.* at 176 n.13.  That argument, the Court

observed, was "disposed of" by *American Pipe*, "which established that commencement of a class action tolls the applicable statute of limitations as to all members of the class."  *Id.*

In *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345 (1983), the Court held that *American Pipe* "permits all members of the putative class to file individual actions"—not merely intervene in the class case—in the event class certification is denied.  *Id.* at 346-47.  Were *American Pipe* limited to intervenors, its reference in *Eisen* would be "misplaced and make[] no sense," as the notice requirement addressed there "was intended to inform the class member that he could preserve his opportunity to press his claim *separately* by opting out of the class."  *Id.* at 351 (emphasis in original).  A class member could not "press his claim separately" if the limitations period had expired while the class case was pending:  "The *Eisen* Court . . . concluded that the right to opt out and press a separate claim remained *meaningful* because the filing of the class action tolled the statute of limitations under the rule of *American Pipe*."  *Id.* at 351-52.

In *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), the Court addressed the Kansas Supreme Court's ruling upholding a judgment for a plaintiff class that consisted of royalty owners residing in all 50 states, D.C., and several foreign countries.  *Id.* at 799.  Defendant asserted that "the 'opt-out' notice to absent class members, which forced them to return the request for exclusion in order to avoid the suit, was insufficient to bind class members who were not residents of Kansas or who did not possess 'minimum contacts' with Kansas," and thus the trial court lacked personal jurisdiction over defendant pursuant to *International Shoe Co. v. Washington*, 326 U.S. 310 (1945).  *Shutts*, 472 U.S. at 802.  Defendant asserted that only an "opt-in" mechanism, whereby each class member would "affirmatively consent to his inclusion within the class," could satisfy due process.  *Id.* at 811.

-20-

Rejecting that argument, the Supreme Court distinguished the burdens imposed on defendants from those of absent class members, who are "not required to do anything," but rather "may sit back and allow the litigation to run its course, content in knowing that there are safeguards provided for [their] protection." *Id.* at 810.  The Court further explained that "[i]f the forum State wishes to bind an absent plaintiff concerning a claim for money damages or similar relief at law, it must provide minimal procedural due process protection." *Id.* at 811-12.  Class members "must," for example, "receive notice plus an opportunity to be heard and participate in the litigation, whether in person or through counsel," and "due process requires at a minimum that an absent plaintiff be provided with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court." *Id.* at 812.

Through these and later decisions, the Supreme Court has instructed that absent class members possess an inviolable right to opt out of a class to pursue their claims separately. *American Pipe* helps preserve that right—and thus the constitutionality of Rule 23, at least as applied to claims predominantly for money damages—by precluding time-for-suit provisions from expiring on class members' claims while the class case encompasses them.  Indeed, *American Pipe* bears particular significance in the context of class settlements that, like the one presently before this Court in the Class Action, come after the repose periods have expired.  In this situation, absent *American Pipe*, class members are forced either to acquiesce to a settlement they deem inadequate or opt out only to preserve time-barred claims.  Their right to opt-out would plainly not be *meaningful*, but rather "a mere gesture." *Mullane*, 339 U.S. at 315.  That "is not due process." *Id.*  Accordingly, Plaintiffs' claims are timely.

### B.   *IndyMac* **Does Not Apply Here.**

Disregarding the above authority, Defendants point solely to the Second Circuit's ruling

in *IndyMac*.  Their reliance on that decision is misplaced.[59]  There, the court of appeals upheld

the district court's order denying (in relevant part) the motions of several absent class members

to intervene as named plaintiffs in the putative class case.  Those class members moved to

intervene after the court granted defendants' motion to dismiss the lead plaintiff's Securities Act

claims to the extent it lacked standing to assert claims arising from securities offerings in which

it did not purchase.  721 F.3d at 103.  The court largely denied the proposed intervenors' motion,

holding that the three-year period applicable to their claims had expired before the motion was

filed.  The court further determined that *American Pipe* did not apply to the three-year period.

The Second Circuit affirmed.  In so ruling, the court declined to decide whether the

*American Pipe* rule constitutes "'judicial tolling,' grounded in principles of equity," or "statutory

tolling (or, 'legal' tolling), based on Rule 23."  *Id.* at 107.  The court determined it "need not try

to divine any hidden meanings in *American Pipe*," for "[i]f its tolling rule is properly classified

as 'equitable,' then application of the rule to Section 13's three-year repose period is barred by

*Lampf*, which states that equitable 'tolling principles do not apply to that period," and "[e]ven

assuming, *arguendo*, that the *American Pipe* tolling rule is 'legal'—based upon Rule 23, . . . its

extension to the statute of repose in Section 13 would be barred by the Rules Enabling Act."  *Id.*

at 109.  Regarding the latter, which provides that Federal Rules of Civil Procedure "shall not

abridge, enlarge or modify any substantive right" (28 U.S.C. § 2072(b)), the court reasoned that

---

[59] As a threshold matter, *IndyMac* only addressed the Securities Act's three-year period, not the five-year period in Section 1658(b).  The statutes are worded differently.  *Compare* 15 U.S.C. § 77m ("In no event shall any . . . action be brought to enforce a liability created under section 77k . . . of this title [i.e., section 11 of the Act] more than three years after the security was bona fide offered to the public, or under section 77l(a)(2) of this title [i.e., section 12(a)(2) of the Act] more than three years after the sale.") *with* 28 U.S.C. § 1658(b) (a fraud action "may be brought not later than . . . 5 years after [the] violation").  Neither the Supreme Court nor the Second Circuit has addressed whether *American Pipe* applies to the five-year period.  The Second Circuit has, however, referred to that provision as a statute of "repose."  *See, e.g., Fed. Housing Fin. Agency v. UBS Ams. Inc.*, 712 F.3d 136, 143 (2d Cir. 2013).

1220845.1

the three-year statute "creates a *substantive* right, extinguishing claims after a three-year period,"

and so "[p]ermitting a plaintiff to file a complaint or intervene after the repose period set forth in

Section 13 of the Securities Act has run would . . . necessarily enlarge or modify a substantive

right and violate the Rules Enabling Act." *Id.* (emphasis in original).

In short, in *IndyMac* the court of appeals confronted motions by absent class members to

intervene to *expand* the putative class by asserting claims as to which the lead plaintiff was

deemed to lack standing.  Indeed, in another part of its opinion, the court (addressing Rules 15

and 24) relied on "the long recognized rule that if jurisdiction is lacking at the commencement of

a suit, it cannot be aided by the intervention of a plaintiff with a sufficient claim."  721 F.3d at

111.  Here, Plaintiffs merely assert claims that were encompassed by the class complaint, and in

so doing have exercised the opt-out right guaranteed them by the Due Process Clause.  *IndyMac*

does not speak to these circumstances, and the court's interpretation of the statute of repose

where class members sought to intervene to assert different claims would, if applied to Plaintiffs'

claims, place Sections 13 and 1658(b) at odds with the Constitution.  The interpretative canon of

"constitutional avoidance" demands that this Court reject Defendants' reading of these statutes.[60]

While the doctrine gives way where a statutory construction "is plainly contrary to the

intent of Congress," interpreting the statutes to permit absent class members to assert claims on

their own behalf that were encompassed by a class complaint filed within the repose periods does

not contravene the "legislative judgment that a defendant should be free from liability after the

legislatively determined period of time."  *CTS*, 134 S. Ct. at 2183.  The scope of Defendants'

liability now is the same as it was when the initial class complaint was filed.  Plaintiffs' claims,

---

[60] *See Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) ("[W]here an otherwise acceptable construction of a statute would raise serious constitutional problems, the Court will construe the statute to avoid such problems unless such construction is plainly contrary to the intent of Congress.").  Neither the parties nor the Second Circuit addressed this issue in *IndyMac*.  *IndyMac* thus does not preclude this Court from accounting for Plaintiffs' due-process rights in interpreting Sections 13 and 1658(b).

which were represented by a plaintiff with standing in the Class Action, have been pursued since

that case was commenced, as Plaintiffs were "treated as parties to the class action until and

unless they received notice thereof and chose not to continue." *WorldCom*, 496 F.3d at 255.

The Rules Enabling Act problem the Second Circuit posited in *IndyMac* therefore does

not exist here.[61]   Applying *American Pipe* as "legal tolling" that emanates from Rule 23, in this

context, "really regulat[es] procedure,—the judicial process for enforcing rights and duties

recognized by substantive law and for justly administering remedy and redress for disregard or

infraction of them.'"  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393,

407 (2010) (plurality op.) (quoting *Sibbach v. Wilson & Co.*, 312 U.S. 1, 14 (1941)).   That is, this

application of Rule 23 "governs only the manner and the means by which the litigants' rights are

enforced," and so "it is valid."   *Id.*   While *IndyMac* precludes an absent class member from

intervening to bring into the class case claims that were not previously encompassed within it

(due to the lead plaintiff's lack of standing to assert them), it does not apply where, as here,

Plaintiffs' claims were encompassed by a class complaint filed by a plaintiff with standing to

assert them.   Accordingly, no "substantive right" of Defendants has been abridged or modified.[62]

_____

[61] As noted above, the court of appeals also held that, if the *American Pipe* rule constitutes "equitable tolling," its
application to Section 13's three-year provision is foreclosed by *Lampf*.   Before the Second Circuit's ruling in
*IndyMac*, this Court held that the *American Pipe* rule embodies "legal," not equitable, tolling, and thus applies to the
statute of repose.   *See In re Morgan Stanley Mortg. Pass-Through Certificates Litig.*, 810 F. Supp. 2d 650, 668
(S.D.N.Y. Sept. 15, 2011) (Swain, J.).   While the Court later, in light of *IndyMac*, vacated its ruling that the repose
period was tolled, *IndyMac* did not reject the notion that *American Pipe* was "legal" in nature.   Rather, the court of
appeals held that *American Pipe* could not apply to a statute of repose *regardless* of whether the rule was
"equitable" or "legal."   This Court thus can, and should, reaffirm its determination that *American Pipe* constitutes
"legal" tolling.   Indeed, the Supreme Court's post-*IndyMac* ruling in *CTS Corp. v. Waldburger* undermines any
classification of *American Pipe* as "equitable," as equitable tolling turns on whether "a litigant has pursued his rights
diligently but some extraordinary circumstance prevents him from bringing a timely action."   134 S. Ct. at 2183.
Application of the *American Pipe* rule expressly does not require diligence or "extraordinary circumstances."   *See
Am. Pipe*, 414 U.S. at 552 ("even as to asserted class members who were unaware of the proceedings brought in
their interest or who demonstrably did not rely on the institution of those proceedings, the later running of the
applicable statute of limitations does not bar participation in the class action and in its ultimate judgment").

[62] Indeed, Plaintiffs respectfully submit that the Second Circuit's Rules Enabling Act analysis does not reflect the
correct standard as articulated by *Sibbach* and the plurality's reasoning in *Shady Grove*, which instructs that "[t]he
test is not whether the rule affects a litigant's substantive rights," as "most procedural rules do," but rather "what the

Defendants' assertion (at 7) that Plaintiffs should be deprived of their opt-out rights—and that they would "suffer no prejudice"—because they could have commenced separate actions within the repose periods is unavailing.  Putting that onus on absent class members would contravene the principle that they "may sit back and allow the litigation to run its course, content in knowing that there are safeguards provided for [their] protection."  *Shutts*, 472 U.S. at 810. Rule 23's safeguards are not limited "to those who are active participants in or even aware of the proceedings in the suit prior to the order that the suit shall or shall not proceed as a class action"; rather, "[n]ot until the existence and limits of the class have been established and notice of membership has been sent does a class member have any duty to take note of the suit *or to exercise any responsibility with respect to it*."  *Am. Pipe*, 414 U.S. at 552.[63]  Defendants would turn that principle on its head by *forcing* absent class members to file duplicative actions while the class case that is supposed to protect them is still pending.

In sum, declining to apply *American Pipe* would deprive Plaintiffs of due process. Defendants cannot overcome that constitutional hurdle by relying on *IndyMac*.

## **CONCLUSION**

Defendants' joint omnibus motion to dismiss on timeliness grounds should be denied.

---

rule itself *regulates*."  559 U.S. at 407 (emphasis in original).  The *Shady Grove* plurality observed that "[a]pplying that test," the Court has rejected numerous challenges to Federal Rules:  While each of those rules "had some practical effect on the parties' rights," each also "undeniably regulated only the process for enforcing those rights; none altered the rights themselves, the available remedies, or the rules of decision by which the court adjudicated either."  *Id.* at 407-08.  Applying *American Pipe* to the statutes of repose in Sections 13 and 1658(b) implicates "only the process for enforcing" the rights afforded under the securities laws.  *See Smith v. Bayer Corp.*, 131 S. Ct. 2368, 2379 n.10 (2011) (observing that *American Pipe* was "specifically grounded in policies of judicial administration").  The Second Circuit also misconstrued *Lampf*, which addressed only the discovery rule, not *American Pipe*; even if the *American Pipe* rule is considered "equitable," it is plainly not akin to discovery-based tolling.  While this Court is bound by *IndyMac*, that ruling is (as detailed above) inapposite.

[63] That Plaintiffs filed their individual cases before notice was disseminated does not render *American Pipe* any less applicable to their claims.  *See WorldCom*, 496 F.3d at 247 (*American Pipe* applies "regardless of whether [class members] file an individual action before resolution of the question whether the purported class will be certified").

Dated: March 6, 2015                    Respectfully submitted,

                                        **LIEFF CABRASER HEIMANN &
                                        BERNSTEIN, LLP**

                                        By:      /s/ Michael J. Miarmi
                                                 Michael J. Miarmi

                                        Steven E. Fineman
                                        Daniel P. Chiplock
                                        Michael J. Miarmi
                                        Nicholas Diamand
                                        Douglas I. Cuthbertson
                                        250 Hudson Street, 8th Floor
                                        New York, NY 10013-1413
                                        Tel:  (212) 355-9500
                                        Fax:  (212) 355-9592
                                        sfineman@lchb.com
                                        dchiplock@lchb.com
                                        mmiarmi@lchb.com
                                        ndiamand@lchb.com
                                        dcuthbertson@lchb.com

                                        *-and-*

                                        Richard M. Heimann
                                        Joy A. Kruse
                                        Bruce W. Leppla
                                        275 Battery Street, 29th Floor
                                        San Francisco, CA 94111-3339
                                        rheimann@lchb.com
                                        jakruse@lchb.com
                                        bleppla@lchb.com

                                        *Attorneys for Plaintiff The Regents of the University
                                        of California*

                                        **BOIES, SCHILLER & FLEXNER LLP**

                                        By:      /s/ Jonathan D. Schiller
                                                 Jonathan D. Schiller

                                        575 Lexington Avenue, 7th Floor
                                        New York, NY 10022

1220845.1

Tel:  (212) 446-2300
Fax:  (212) 446-2350
jschiller@bsfllp.com

*Attorneys for Plaintiff Kuwait Investment Authority*

**SUSMAN GODFREY LLP**

By:      /s/ Mark H. Hatch-Miller
         Mark H. Hatch-Miller

560 Lexington Avenue, 15th Floor
New York, NY 10022
Tel:  (212) 336-8330
Fax:  (212) 336-8340
mhatch-miller@susmangodfrey.com

*-and-*

Stephen D. Susman
560 Lexington Avenue, 15th Floor
New York, NY 10022
Tel:  (212) 336-8330
Fax:  (212) 336-8340
ssusman@susmangodfrey.com

*-and-*

Harry P. Susman
1000 Louisiana Street, Suite 5100
Houston, TX 77002-5096
Tel:  (713) 651-9366
Fax:  (713) 654-6666
hsusman@susmangodfrey.com

*-and-*

David D. Shank
901 Main Street, Suite 5100
Dallas, TX 75202
Tel:  (214) 754-1935
Fax:  (214) 754-1933
dshank@susmangodfrey.com

*Attorneys for Oppenheimer Plaintiffs and Pacific Funds and Pacific Select Fund Plaintiffs*

**GRANT & EISENHOFER, P.A.**

By:      /s/ Geoffrey C. Jarvis
             Geoffrey C. Jarvis

Jay W. Eisenhofer
485 Lexington Avenue
New York, NY 10017
Tel:  (212) 722-8500
Fax:  (212)336-8340
gjarvis@gelaw.com
jeisenhofer@gelaw.com

*-and-*

John C. Kairis
123 Justison Street
Wilmington, DE 19801
Tel:  (302) 622-7160
Fax:  (302) 622-7100
jkairis@gelaw.com

*Attorneys for British Coal Plaintiffs*


**ROBBINS GELLER RUDMAN & DOWD LLP**

By:      /s/ Theodore J. Pintar
             Theodore J. Pintar

Darren J. Robbins
Thomas E. Egler
Susannah R. Conn
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel:  (619) 231-1058
Fax:  (619) 231-7423
darrenr@rgrdlaw.com
tedp@rgrdlaw.com
tome@rgrdlaw.com
sconn@rgrdlaw.com

*-and-*

Samuel H. Rudman
58 South Service Road, Suite 200

Melville, NY 11747
Tel:  (631) 367-7100
Fax: (631) 367-1173
srudman@rgrdlaw.com

*Attorneys for Plaintiff Teachers Retirement
System of the State of Illinois*


**KIRBY McINERNEY LLP**

By:     /s/   Daniel Hume        
              Daniel Hume
Ira M. Press
Meghan J. Summers
825 Third Avenue
New York, NY 10022
Tel:  (212) 371-6600
Fax:  (212) 751-2540

*Attorneys for Plaintiff GIC Private Limited*

-29-

1220845.1